UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARL J. DIXON,<br><br>        Petitioner,<br><br>  vs.<br><br>M. D. BITER,<br><br>        Respondent. | No. 2:11-cv-2047-EFB P<br><br><br><br>ORDER |

Petitioner is a state prisoner proceeding without counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] He challenges a judgment of conviction entered against him on June 10, 2008, in the Solano County Superior Court on charges of second degree robbery with personal use of a firearm. He seeks federal habeas relief, claiming that the firearm sentence enhancement was not supported by sufficient evidence. Upon careful consideration of the record and the applicable law, the petition is denied.

**I.  Background**

In its unpublished memorandum and opinion affirming petitioner's conviction on appeal, the California Court of Appeal for the First Appellate District provided the following factual summary:

---

[1] This case is before the undersigned pursuant to the parties' consent. *See* 28 U.S.C. § 636; Fed. R. Civ. P. 73.

1

A jury found defendant guilty of second degree robbery in violation of Penal Code section 211[2] and found that he personally used a firearm within the meaning of sections 12022.5, subdivision (a)(1) and 12022.53, subdivision (b). Defendant contends on appeal that substantial evidence does not support the firearm enhancement. The record supports the jury's verdict that defendant personally used a firearm and we affirm the judgment.

**BACKGROUND**

**The Charges**

On October 31, 2007, an information was filed charging defendant with second degree robbery (§ 211). The information also alleged that defendant personally used a firearm in the robbery within the meaning of section 12022.5, subdivision (a)(1) and section 12022.53, subdivision (b).

**The Trial**

**The Prosecution**

Trial began on June 2, 2008, and the prosecution presented evidence that on August 17, 2007, Augusto Leyva was working as a cashier at a gas station and convenience store in Vallejo. About 9:20 p.m., Leyva was counting money that he was going to place in the safe. He separated the money into various denominations and then placed rubber bands around the different denominations.

As Leyva counted the money, a person entered the store. Leyva stated that he looked at the person coming in the door for one or two seconds. When asked at trial what the person looked like, Leyva responded: "I couldn't tell exactly what he looked like. What I can tell you is that he was African-American and he was wearing a cap and glasses, which is the normal attire for that area." Levya added that the person entering the store was wearing a black sweater with a hood over his head and he was not sure whether he was wearing a hat underneath the hood. The person, according to Leyva, was wearing blue "Drill jeans."

Leyva first described the person entering the store to the police as wearing dark sunglasses. He testified at the preliminary hearing and at trial that the person was wearing glasses that had clear lenses. At the preliminary hearing, he described the "sides" or frames of the glasses as being black, but said they were white during his testimony at trial. Subsequently, he testified that he could not really remember the color of the sides of the glasses.

/////

/////

/////

---

[2] All unspecified code sections refer to the Penal Code.

2

Leyva said, after entering the store, the man walked towards the cooler and at some point he covered his nose and mouth with a mask. Soon thereafter, the man startled Leyva by entering the cashier area behind the counter. He brandished a gun that was a black semi-automatic pistol; he commanded Leyva to be quiet. The gunman was wearing black gloves.

The gunman demanded money from Leyva. Leyva dropped the money he was counting onto the floor. After picking up the money from the floor, the gunman told Leyva to open the register. Leyva opened the register, and the gunman took money from the register. Leyva told the police that he believed the robber took about $1,000.

After the gunman removed the money from the cash register, another customer entered the store. The gunman removed the mask from his face. The customer asked for gas and Leyva mouthed, "Call 911" to the customer. The customer left; the gunman left right after him. Leyva pushed the panic button to summon the police.

Leyva then left the store and followed the robber from a distance. The gunman jumped over a barrier into the parking lot that was behind the station's car wash. Shortly thereafter, Leyva saw a blue Ford Bronco leave the parking lot. Leyva noticed that the Bronco had been the only vehicle in the parking lot. Leyva returned to the store and called 911.

Officers Shane Bower and Jerome Bautista were on duty the evening of August 17, 2005. Around 9:30 p.m., they received a dispatch that a robbery had occurred at the gas station and that the suspect had fled in a dark blue Ford Bronco. Immediately after hearing the dispatch, Bower saw a blue Ford Bronco with a tan camper shell about one quarter of a mile from the gas station that had been robbed; he initiated a traffic stop. After additional officers arrived, Bower ordered the driver out of the car. Defendant was the driver; he was wearing dark clothing and "clear-lensed glasses" on top of his head. Also in the car were defendant's brothers, Sterling Jones and Gabriel Jones, and Irma Perez. After defendant got out of the car, the others also got out of the car.

The officers searched the Ford Bronco. They found a handgun under the seat, a police scanner, $947 in cash, some of [sic] sweatshirts, one black and one grey glove, and a set of black pantyhose that had one leg cut off. Some of the money was rolled up and some was grouped together with rubber bands. The officers also found several T-shirts, a number of hats, and three pairs of athletic shoes in the back seat and in the rear cargo area of the Bronco. There was an inside-out black sweatshirt crumpled up in the back of the car.

Officer Sean Kenney went to the gas station and took Leyva to the location where the officers had stopped the Ford Bronco. Kenney told Leyva that he might be able to identify the suspect. Leyva explained that he did not want to put an innocent person in jail. Leyva remained in the back seat of Kenney's car while the officers

brought, one at a time, each occupant from the Bronco to him. When defendant was brought, Leyva immediately identified him as the robber. Leyva emphasized that he did not want to identify someone who was not guilty. Leyva testified that he identified defendant as the robber "[b]ecause of his build and the glasses on his head." The other people in the car were not wearing any glasses. Defendant was wearing a black T-shirt, dark blue baggie jeans, dark tennis shoes, and glasses.

Leyva believed the gun found in defendant's car was the weapon the robber used. He also identified money found in defendant's car as the money stolen from the gas station. He explained that the rubber bands around the money were the same type that he used to bundle the money and that the bands were wrapped around twice, which was how he had bundled the money. The money was separated by denominations. He said that the pair of gloves found in defendant's car did not resemble the ones that the robber wore. He was unsure whether the sweatshirt found in the Bronco was the same one worn by the robber.

The night of the robbery, Officers Jim Melville and Joseph McCarthy interviewed defendant and the other three occupants in the Ford Bronco at the police station. McCarthy conducted the videotaped interview with defendant and Melville was in the room during the interview. McCarthy advised defendant of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Defendant explained that he stopped to get gas and remained there probably five minutes. He said he probably had a black "hoodie on" and was the only one in the Bronco who went into the convenience store.

McCarthy told defendant that "people have already picked you out ." The following exchange occurred between McCarthy and defendant:

"Q. Let's - let's toss it - let's talk brass tacks here, man. Okay? Nobody got hurt. All right?

"A. Okay. Well, if I'm been already picked out then (unintelligible) . . . .

"Q. I just wanna - I wanna know . . . was the guy mistaken?

"A. Just said if I'm been already picked out then, that's what the witness say was me, then it was me.

"Q. Okay.

"A. If that's what you got, 'cause (unintelligible) . . . .

"Q. Well, I wanna know why? And it's not a matter of if, it's a matter of why. Okay? You need money . . . ."

Subsequently, defendant stated: "[A]ctually, I'm just gonna off of what you just said. The witness said it was me. So, it was me. I can't really give you a reason why I would [do] something like that.

4

But if the witness says it was me, it was me . . . ." McCarthy asked him if he was going to accept that, and defendant responded, "If that's what you're saying the witness said." Defendant then said that he wanted to see the witness's statement. Defendant admitted that the Ford Bronco belonged to him and when asked whether the gun found in the car belonged to him, defendant answered: "If it's under my seat, man, it's my car. You said the witness has seen me with it. Then okay, there you have it. You got your picture. That's what your witness said. You got your witness, then that's it. There's nothing else to be talking about." McCarthy asked defendant to explain the reason the money was stuffed into the pocket in the car and defendant replied: "Shit, I can't tell you. I mean, what's the witness logical reason for picking me out. If he said I did it to him."

Shortly thereafter, McCarthy said, "I'm asking you what the logical reason is for doing this." Defendant answered: "Logical reason is, if he said I did it, you all got the statement that he said I did it, picked me out. There's nothing else to talk about." McCarthy asked, "And you just want to roll with that?" Defendant answered: "Yep. That's what the witness said. I would like to see the witness statement." Defendant elaborated: "Well, you all got a witness, man. There ain't nothing else we should be talking about. If the witness said it was me. He picked me out . . . . Why you finally here? All evidence points to me, then I guess it was me. That's what your witness said." He added: "So, I guess it was me." Defendant told the officer that he did not know how much money was in the car and that he did not "count" his money. He added: "I probably had gloves on. The witness probably say - I just want a witness statement . . . . Everybody else good to go. Give me my charge and we can roll. 'Cause I don't want innocent people getting in trouble for something I did." Later, defendant said that the witness was lying.

In March 2008, the police showed Leyva a few seconds of each video of the police interviews with defendant and his brothers to see if he could recognize the robber's voice. McCarthy testified that Leyva said that he was positive that the voices of the brothers, Sterling and Gabriel Jones, were not the voice of the robber. When he listened to the tape of defendant, Leyva said that he was positive that the voice on the tape was that of the robber. He then clarified that, at the time he identified the voice, he was 60 to 70 percent certain that defendant's voice was that of the robber. McCarthy testified that defendant's voice was lower than the voices of defendant's two brothers.

Officers Melville and McCarthy went to the gas station to obtain a surveillance videotape from the night of the robbery. They met with the gas station manager, Jessica Lowe, and watched the video together. Melville said the video was of poor quality. It showed an African-American male entering the store wearing a black hooded sweatshirt with a white stripe, a baseball-type hat, gloves, dark pants, and dark shoes. He was holding a gun in his right hand, at waist level. The man walked to the cashier area and removed money from the ground and cash register. Melville stated that the

5

sweatshirt found in defendant's Ford Bronco looked like the hooded sweatshirt with the white stripe that was in the video. He was not able to see the robber's face.

The surveillance system was digital and did not have a videotape in it. Melville claimed that Lowe told him that she did not know how to download or preserve the video and that the images were held for about one month. A number of attempts were made to download the video, but the officers did not have the right connections or equipment and could not do it. At a later date, when Melville returned to the gas station, he tried to view the video again, but it was no longer there. He did not know if it got erased because of the passage of time or because it had been unhooked.

**The Defense**

Defense presented evidence that the officers were told that the tape would erase itself within one week. The officers viewed the tape but never recorded a copy of the robbery before the tape erased itself. The defense also presented evidence that Leyva attended a lineup on November 27, 2007, with six suspects; he did not identify defendant, who was in the lineup.

Defendant and his brother, Gabriel Jones, testified that on August 17, 2007, they were going with their brother Sterling Jones and Irma Perez to visit friends. During the day, they played dice games and won approximately $600 to $700. They stopped for gas at the gas station in Vallejo and then headed out towards the freeway, but they became lost and returned to the gas station to orient themselves. They were driving back to the freeway when the police stopped them. The scanner and gun belonged to Gabriel. He had kept the gun for protection ever since his younger brother had been murdered. He listened to the police scanner out of curiosity and for entertainment. Gabriel claimed he cut the pantyhose to wear on his head like a stocking cap.

Defendant stated that he was wearing clear glasses with designer frames on the night of his arrest. When he spoke to McCarthy on the night of his arrest, defendant explained that he was upset that he had been arrested and not told the reason for his arrest. He insisted that he never intended for his statements during the police interview to be an admission.

**The Verdict and Sentence**

On June 10, 2008, the jury found defendant guilty of second degree robbery, and found the personal gun use allegation true. On December 19, 2008, the trial court sentenced defendant to a total term of 13 years, which included a mid-term sentence of three years for the robbery and a 10-year enhancement for the personal use of a firearm within the meaning of section 12022.53, subdivision (b). The trial court stayed the second firearm use enhancement (§ 12022.5, subdivision (a)(1)).

/////

*People v. Dixon*, No. A123613, 2010 WL 597499 (Cal.App. 1 Dist. Feb. 19, 2010) (unpublished disposition) (hereinafter Opinion), at **1-5.

After the California Court of Appeal affirmed petitioner's judgment of conviction, he sought review in the California Supreme Court. ECF No. 13-1 at 6. His petition for review was summarily denied. *Id.* Petitioner did not file any state habeas petitions.

## II. Analysis

### A. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S. ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe,* 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court

jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412; *accord Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

8

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 133 S. Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no

reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

### B.     Insufficient Evidence

Petitioner's sole claim for federal habeas relief is that the evidence introduced at his trial was insufficient to support the firearm sentence enhancement. He argues that, while the evidence might have been sufficient to show he was "armed" with a weapon, it did not show he "used" the weapon. ECF No. 17 at 4-8. Specifically, he contends "there was not gun related conduct coupled with facilitative intent, which together can distinguish 'use' from mere possession." *Id.* at 7. Petitioner notes that the evidence showed he put the gun away after initially exposing it, and that he never pointed the gun at Leyva. *Id.*

### 1. State Court Decision

The California Court of Appeal denied petitioner's claim of insufficient evidence, reasoning as follows:

> Defendant's sole argument is that the record does not support his conviction for the personal use of the firearm within the meaning of section 12022.53, subdivision (b). He does not challenge his conviction for second degree robbery, but maintains that there was insufficient evidence that he was the direct perpetrator of the robbery.
>
> "'When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence – i.e., evidence that is credible and of solid value – from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 364.) If the findings are reasonable and supported by the evidence, reversal is not warranted because a contrary finding might also be reasonable. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) The testimony of a single credible witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

> Section 12022.53, subdivision (b) provides that "any person who, in the commission of [robbery], personally uses a firearm" that person is subject to a consecutive enhancement of 10 years. The statute does not require that the firearm is discharged as the mere "display of a firearm" that produces fear is sufficient conduct to impose the enhancement. (*People v. Bland* (1995) 10 Cal.4th 991, 997.) The prosecution, however, has the burden of proving beyond a reasonable doubt that a specific defendant personally used a firearm to uphold the enhancement. (*People v. Jones* (1999) 75 Cal.App.4th 616, 631.)
>
> In the present case, the record contains sufficient evidence to support the jury's finding that defendant was the person who used the gun to rob Leyva. The record showed that one of the three men in the Ford Bronco robbed Leyva. The Bronco was stopped near the gas station right after the robbery; the car matched the description of the vehicle seen departing the scene; the amount of money recovered from the car was about the same amount Leyva estimated had been taken from the gas station; the money removed from the car was separated into denominations with rubber bands and Leyva had separated the money in that manner; and the gun found in the car matched the description of the gun provided by Leyva. Additionally, the black sweatshirt removed from the car was similar to the clothing the robber had worn.
>
> The evidence also supported a finding that defendant was the actual robber. Defendant and his brother testified that defendant was the only person from the Bronco who had entered the convenience store. Shortly after the robbery, Leyva identified defendant as the robber when the police separately brought defendant and his brothers to Leyva. Leyva stated that he did not recognize either of the brothers. Subsequently, Leyva identified defendant's voice as being the voice of the robber after hearing the police interviews. At trial, Leyva stated that he was about 60 to 70 percent sure at the time he heard the voice that was the voice of the robber. McCarthy testified that defendant's voice was distinctively lower than the brothers' voices.
>
> Furthermore, the jurors heard defendant's interview with McCarthy. Defendant repeatedly said that if the witness said he was the robber, he must have been the robber. He told McCarthy that he was the only person in the car who had gone into the convenience store and that he was wearing a black "hoodie." He maintained that he did not want the other people in the car to be arrested or to get into trouble for something he did.
>
> In arguing that the record does not support the conviction for personal use of a firearm, defendant argues that the evidence in the record "does not conclusively establish" that defendant was the actual gunman who robbed Leyva. When reviewing a verdict for substantial evidence on appeal, the question is not whether the evidence "conclusively" establishes guilt, but whether the evidence is sufficiently reasonable, credible, and of solid value so that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

11

"[I]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Defendant maintains that the prosecutor began his argument by telling the jury that "the only real issue is which brother committed the robbery[,]" and this argument showed that the prosecutor recognized that the evidence that defendant was the actual gunman was weak. The prosecutor, however, made no such admission. The evidence uncovered in the Ford Bronco overwhelmingly established that one of the people in the car had committed the robbery. Thus, the only real issue for the jury to decide, as the prosecution argued, was whether defendant was the person who had entered the store and used a firearm to rob Leyva.

Defendant also points out some of the problems with Leyva's identification of defendant as the robber. He argues that Leyva said he was wearing a white T-shirt and black sweatshirt, but defendant was apprehended wearing a dark T-shirt and no sweatshirt. Defendant's two brothers were wearing white T-shirts. Defendant also emphasizes that Leyva initially described defendant's glasses as being dark, but then testified that the lenses were clear. He also changed his testimony regarding the color of the frames. Defendant stresses that Leyva's shifting description of the glasses was particularly important because Leyva said that he distinguished defendant from his brothers based on his wearing glasses.

The jury heard Leyva's different descriptions of the glasses. The jurors also heard Leyva's explanation that he changed his mind regarding the glasses with the benefit of time and that he was not certain that his description of the glasses was accurate. Officer Kenney recalled that Leyva initially described the glasses as big, "fashion style" glasses, but could not remember if Leyva said they were sunglasses. In any event, this was evidence for the jury to consider when deciding whether Leyva's identification of defendant was accurate. Leyva did not identify defendant solely on the basis that he was the only person wearing glasses; he also identified defendant based on his body type. Later, he identified defendant based on his voice. Finally, Leyva's description of the robber's clothing was accurate in the respect that he said that he wore a black sweater or sweatshirt with a hood and defendant admitted that he wore a black "hoodie" when he entered the store.

Defendant argues that there was no evidence that he was the actual gunman in the store. However, as already stressed, the record supports the finding that he was the actual robber in the store. There was no dispute that defendant was the only person in the Bronco who had gone into the store. Defendant argues in his reply brief that his clothing and admission that he went into the store do not connect him to the firearm. Defendant ignores that each piece of evidence is not considered in isolation. Rather, this evidence is considered with the overwhelming evidence that one of the three men in the car committed the robbery, and all of the evidence

12

>>indicated that defendant – not his two brothers – was the person who used a gun to rob Leyva.
>
>>Accordingly, we conclude that substantial evidence supported the jury's finding that defendant was the robber and that he used a firearm when carrying out the robbery.

Opinion at **5-7.

### 2. Applicable Legal Standards

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, ___ U.S. ___, 132 S.Ct. 2, *4 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." *Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, ___ U.S. ___, 132 S.Ct. 2060, 2064 (2012) ( per curiam ) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir.1995) (citation omitted). "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

/////

### 3. Analysis

Cal. Penal Code § 12022.5(b) provides:

> Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply.

As noted by the California Court of Appeal, the requirements of this statute are satisfied if the defendant merely displays the firearm, thereby producing in the victim "a fear of harm or force." *People v. Bland*, 10 Cal.4th 991, 997 (1995). The gun need not be pointed at the victim; it is sufficient if the perpetrator merely shows the victim a gun. *People v. Carrasco*, 137 Cal.App.4th 1050, 1059-60 (2006).

Here, Leyva testified that the gunman showed him a weapon and told him to be quiet and to "give him the money." Opinion at *1, Reporter's Transcript on Appeal (RT) at 93, 95, 153. Leyva further testified that he was "afraid of the gun" and afraid that that he might be killed. RT at 98-99. There is no evidence in this case that the exposure of the firearm was accidental or inadvertent. The evidence introduced at petitioner's trial is sufficient to support petitioner's conviction of the firearm enhancement, as that enhancement is interpreted in California law.

With respect to whether petitioner was the person who took the money from Leyva, the California Court of Appeal noted that Leyva identified petitioner as the gunman, the evidence reflected that one of the three men in petitioner's vehicle entered the convenience store, and petitioner and his brothers both testified that petitioner was the only person from their vehicle who entered the store. Opinion at **2, 3, 4. These factual findings are supported by the state court record. RT at 55-57, 122-23, 141-42, 187-90, 463, 469. This evidence is sufficient to support the jury finding that petitioner was the person who brandished the gun at the convenience store.

After reviewing the record in the light most favorable to the jury's verdict, this court concludes that there was sufficient evidence introduced at petitioner's trial to support the firearm enhancement. Given the nature and extent of the evidence against petitioner, a rational trier of fact could have found the essential elements of the enhancement beyond a reasonable doubt. This

is true even though there was other evidence which indicated that Leyva's description of the gunman or the events at the convenience store was contradictory in some particulars or was slightly different from his testimony at the preliminary hearing. Despite these contradictions, the decision of the California Court of Appeal rejecting petitioner's claim of insufficient evidence is not contrary to or an unreasonable application of *In re Winship* to the facts of this case. Accordingly, petitioner is not entitled to federal habeas relief.

### III.     Conclusion

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's application for a writ of habeas corpus is denied;

2. The Clerk of Court is directed to close this case; and

3. The court declines to issue a certificate of appealabilty.

DATED: April 9, 2014.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE